Good morning, all. Our first case for argument this morning is Dahlstrom v. Sun-Times Media, Mr. Dunn. Good morning, Your Honors. I'm Damon Dunn. I'm here today to argue on behalf of Sun-Times Media, the publisher of the Chicago Sun-Times Daily Newspaper, for the dismissal of the case filed by plaintiff's Chicago Police Department officers. We're here because, essentially on the invitation of the district court, which has asked this court to review its orders construing the Driver Privacy Protection Act, I'll call it the DCPA, and the First Amendment concerns. The district court was in part motivated by the fact that the lineup story at issue in this case is an investigative report, a truthful investigative report, on a matter of heightened public concern, political favoritism in a homicide case. Indeed, the lineup story eventually led to the appointment of a special prosecutor and the conviction of involuntary homicide for the then mayor's nephew. Sometimes reporters found out, among other things, the Chicago Police Department knew in 2004 that the mayor of Chicago's nephew, Richard Venneco, threw the punch that killed the smaller David Koshman. You understand we've read the briefs. Then I think that the only thing we need to emphasize at this point is that the Sun-Times had to drag the information out concerning the lineup fillers that were used by filing a FOIA appeal with the Illinois Attorney General. That provided the photographs and the names, and then it obtained confirming detail from the Secretary of State by asking. We have in this case one public agency supplying information that another public agency or public officials are trying to suppress, and that information was not gratuitous as found by the district court, which said this is a rare case where the government officials' height and weight relate to whether they should have been used as filler alongside Venneco. After the story was published, the Fraternal Police immediately sued to censor the story, and when the privacy claims were rejected by Judge Hyman in the circuit court, they repaired to this forum, hanging their hat on the word including in the Driver's Privacy Protection Act. We're here today to ask the court to find that the plaintiff's expansive construction of the act is controtextual. If it accepted, it would cause significant and irreparable due process concerns because it would be void for vagueness. And just as importantly, that using the DPPA to penalize the press for publishing truthful story on a matter of heightened public concern not only doesn't advance the DPPA's goals, but is clearly violative of the First Amendment. Turning right to the question of statutory construction, I think the district court put its finger on the distinction that matters. It's a question of coming down to description or identification. Anyone reading the DPPA will see and not suspect that prescribes commonly shared identifiers, shared by millions, tens of millions of Americans. And although that was anyone, it apparently includes the Illinois Secretary of State, which supplied the information. The operative paragraph regarding the definition says that the information must identify an individual, and then it lists a series of identifiers. It's undisputed here, the Sun-Times did not use any of the identifiers in the statute. Well, you mentioned height and weight. Didn't the Sun-Times use middle initials and, I think in at least one instance, a junior or something like that? The names were provided by the FOIA request. The full names, including middle initials? I don't have that with me, but I would say with respect to middle initials, they're not names. If middle initials could identify someone, then I think maybe we would get into that discussion. But a middle initial isn't going to identify anyone, and indeed the middle initials are available on the city's website. Well, they would distinguish, say, John R. Jones from John J. Jones, so the public would have a more accurate idea of who the individual was. And we could log right on to the city of Chicago's website and figure out which one's the police officer. So that same distinction is available on the website? It's publicly available information. But more importantly, I don't think a middle initial is an identifier, unless we go into this totality argument and we get to pick and choose, mix and match what types of facts will get us to the point where we can identify an individual. And I know the government makes that argument. But that's a case of where someone reads the statute and says, okay, I can't publish this, so I'll publish that. And then the government comes back and says, no, no, no, no, that means this, too. And that kind of confusion of disservice to citizens, that's when you have to really guess at the contours. Well, do I include weight with height? Have I stepped over the line? That, I think, is fundamentally an abuse of the statute. And I think that brings us right back into, say, the mail fraud, honest services cases, which culminate in U.S. v. Skilling, where, once again, people have to guess. And this is a statute which we must remember includes criminal penalties. Even if they're not being sought here, they're available elsewhere at the government's discretion. And the district court itself said, you know, there's a good argument that the DPPA only reaches information that will actually identify, rather than merely describe, a particular individual. And I think that interpretation is consistent with this court's recent construction in Sturt v. Redbox. It's just a common sense interpretation of the statute. So we're really only here because of the dicta, or maybe it's not even dicta, maybe it's just a recital in the Sene case, which this court is uniquely suited to clarify. And Sene really shouldn't be expanded because there's no publication of unique identifiers in this case. If we're going to enlarge the statute to include descriptions, then we're reading the key qualifier information that identifies out of the case. And the district court itself was reluctant to do that. It noticed that the list in the DPPA will identify a person with a very high degree of particularity, whereas the facts published by the Sun-Times were merely descriptive. And what's more, jumping to the First Amendment context, this court's recent decision in Wisconsin right to life is when we're talking about speech, the language include, in that case it was include but not limited to, ends with a broad and imprecise language that risks chilling speech. And that would be exactly here, Your Honor, if we'd say, oh, wait a minute, we throw in this extra word, we've stepped over the line because that's included by implication in the statute, then I think we run right afoul of Wisconsin right to life v. Barlow. We run right up against the doctrine of constitutional avoidance. So in this case, I think maximum clarity should be what would guide this court's interpretation of the statute. And propagating uncertainty would really be a disservice, not only to the First Amendment,  the DPPA can be construed commonsensically to limit itself to the list itself, or at the very least under principles of statutory construction to like categories of information, which commonly share attributes. We're not talking about a mole on a nose. We're talking about brown hair. You'd have to think of something else besides hair. Intriguing. One of the fillers, I think, is listed as bald, Your Honor. Thank heavens. I'll be there soon enough. I think then turning to the constitutional argument, and the question is really, does the First Amendment protect news gatherings? And I can't think of a more stark contrast where we have a core function of the free press reporting on police protection being suppressed by the police. This is the quintessential First Amendment censorship type of case. The district court originally was reluctant to see that, but in the wake of this court's decision in ACLU, Illinois v. Alvarez, which extended protection to news gathering, and that didn't even involve the press. The Illinois eavesdropping statute actually had a carve-out for the press, just like the Illinois permissible use statute of the DPPA has a carve-out for the press and public safety. I submit maybe the Congress didn't put that carve-out in because it knows we have a First Amendment and that trumps any legislation it has, but it might have achieved some clarity in this instance. By the way, ACLU also holds that it completely rejects plaintiff's notion that the police have a privacy interest in their appearance when performing their public duty, something that's been consistent with almost every case that has addressed this question in Illinois. But more importantly, ACLU points out that even in a statute of general application, when the expressive activity triggers the application of the law, the First Amendment interests are in play, and that was a pre-enforcement statute. That wasn't a case of actual government officials trying to censor a story that's already been published. And I think on top of that, then we add Wisconsin right to life, which points out that laws affecting speech actually have to reach a higher standard of clarity and precision. And indeed, if we look at this latest Supreme Court term, we see a veritable deluge of cases upholding First Amendment protections in a variety of contexts which aren't classic speech cases, unlike what we have here. I just cite McClellan v. Coakley, which is just involved standing on a public way, yet even though the statute said nothing about speech on its face, the Supreme Court validated it. Here I think the D.C. Circuit's approach in the Ampersand publication v. NLRB case should apply. We just invalidate the application. But frankly, I'm not convinced this statute achieves any kind of constitutional validity if we accept plaintiffs' gloss on it to render it essentially a pick and choose, guess what may. This case does not involve access to information. This involves a penalty for having published. I think it falls right into the Bartnicki category of cases. Mr. Dunn, the public interest in this case was the fairness of the lineup. Would you say that's the public interest here? I think you might be slicing it a little bit too finely, Judge. I think that the public interest in this case was police favoritism, I mean, in a general sense. Well, so the lineup is a subset of that subject. I would say that that's the case. And as I understand from the briefs, the Sun-Times position is this is newsworthy because this lineup was, I don't want to say too fair, but because your position is that there are such similarities. If I asked a Sun-Times reporter, their position would be the lineup was rigged. Was what? Was rigged. Oh, I appreciate that, your position. Understanding that, to validate that point, would the Sun-Times have been justified in a FOIA request of the last 90 days, 180 days of lineups generally conducted by the Chicago Police Department in support of the position that they believe would indicate the vice that you suggest has occurred? The Sun-Times story, I think, fairly asks questions. It doesn't provide answers. I don't think at that time the reporters were in a position to provide answers. They have filed many FOIA requests with respect to the Kashman investigation. They've been rebuffed on more requests than they've received. I appreciate that. That may be some collateral history. But my point is, as to the focus of the FOIA request, would you say to validate the assumption that was made by reporters that there would be an acceptable FOIA request of the last 90 days of lineups to just do for comparative purposes and to substantiate the assumption of the reporters? I would suggest not. I can't really go in because it's privileged information as to why the Sun-Times had information suggesting that this lineup was rigged. But I'm not asking for that. There's also the question of just how much resources can a news operation in today's environment address to a story? In this case, the question should be go get the answers and the public officials should willingly supply them. And to just go a step behind your honors question of validation, the special prosecutor himself, Daniel Webb, in his report says, why was there a lineup? You knew who did it. Yeah, but I guess my concern, Mr. Jones, is our obligation to interpret the sweep of the DPPA and its constitutionality. So I'm just trying to get some sense of how sweeping this would be. I appreciate your saying, well, we can limit it for this ride. This ticket, good for this ride only, but we have issues here that are a little broader than that. I think that the court has to recognize the limitations on the press when it's prying information out of the government. And it should recognize the context of the story, which is the first in a series of stories. I don't know if it's the first, but it was early in a series of stories. At that point, they're still asking questions. I'm an avid reader of at least five publications on a daily basis, including the Sun-Times. And correct me if my impression is wrong, but I understood the gist of what the story was, that the people used in the lineup were too much like the ultimate defendant. Am I correct? Yes, it was a belated lineup. Isn't that what the lineup is supposed to do, have people look alike so that the defendant is protected from having a midget stand next to a 6'7 fellow, that sort of thing, or one black and five whites and that sort of thing? And I think that explains why we had— Well, now, why is the complaint that they look like the defendant? That's what the lineup is supposed to do. Well, in this case, they look like mirror images. They look like mirror images. Well, that would be the ideal, I suspect. It makes it more difficult for the proposed finger person to pick the wrong guy. And I appreciate the countervailing interest there. Yeah. In this case— Well, why would the ACLU be on your side then? Because they were always on the other side. The lineup looked goofy. Strange bedfellows. I don't know. Well, you brought up the ACLU. Here's the point, I think. If you look at that graphic, somebody had to go out there and comb the CPD and drag those officers in. Is there anything empirical in the record to show that? The graphic, I think, speaks for itself, Your Honor. I mean, their weight varies by only a few pounds. Their physical shape looks the same. Have you walked into a police— There are 13,000 policemen in the city of Chicago. Have you ever walked into a squad room and looked at them? Frankly, you can walk into a room and figure there's heat there, and they all look alike. And they wear the same uniform. They're the type. They eat a lot of donuts, which adds to the program. Whatever the merits of how the lineup was picked, I think that it's indisputable it was a legitimate question to ask, especially in light of all the other investigatory unanswered questions. But all those things you said can be done without identifying with, for great particularity, who were the members. A description does not have to have names, ranks, serial numbers, and addresses. Well, we didn't put any of this stuff in the— What did you put in? We put in the physical characteristics only. We didn't put in home addresses. We didn't put names. That came from FOIA. We only put in the characteristics and— Name characteristics. The argument consumes itself, Your Honor, because that information was used precisely because these people look like fraternal twins. Right. HCI would be overjoyed with that program. Well, in this interest, I think I'm going to go with the First Amendment interest in covering political favoritism. I yield to no man am I. Yes, and I understand that, but I think it's a legitimate question to have raised, and I think it was seconded by the special prosecutor. We want to know why there was a lineup in the first place, and I think the fact that we're saying, oh, but similarity, that's a goal to be had? Well, yes, and that's why you go to the Secretary of State and you get the confirming detail that shows there's more than similarity here. There is, in effect, an attempt to defeat the eyewitnesses so that we can then lose the files, and then we don't have to prosecute six years later. I've eaten up part of your time, but I'm sure Judge Lam will give you some back. Yes, and I see I'm into my rebuttal. I don't think there's much to say about the neutrality test. I mean, here we don't have a government interest because these police officers' privacy is not involved, their safety is not jeopardized. If anything, the public interest and public safety is we report this, and more importantly, there's a direct burden on the First Amendment. With respect to the relief requested, censorship is censorship, past, present, or future. I don't think there's any distinction you can draw, and the recent First Circuit billboard case, it's not in our briefs because it was just recently decided. I think it's got a complicated name, and it's in my papers here somewhere. Basically, it talked about revoking a billboard permit. It said it's the same thing. You're revoking speech that's ongoing. It's a First Amendment violation. They allowed a patient challenge. I'm low on my time, so I'll excuse myself. Thank you, Mr. Dunn. You'll have some rebuttal time. Mr. Tenney? Oh, Mr. Starr. I'm sorry. Good morning, Your Honors. If it pleases the court, my name is Sean Starr, and I represent the plaintiff appellees, which I'm going to collectively refer to as the officers. The Sun Times, in their reply brief, states that the fundamental question in which this appeal turns is how could a reporter who reads the DPPA have any idea that it covers the type of personal information that they publish, that it covers heights, weights, hair colors, eye colors, et cetera. It's our position that the Sun Times could have figured that out in a variety of ways, and that it chose not to. The Sun Times could have looked at the act's plain language and on its face read that personal information is defined as information that identifies an individual and used a common-sense approach that physical characteristics help people identify other people. It could have considered the act's primary purpose, looking at the legislative intent and the broader context in which the act protects personal information from falling into the hands of would-be stalkers. Furthermore, it could have read case law. While the case law is not determinative, it's certainly instructive in regards to what types of information is protected. You anticipate that the investigative reporter is also a lawyer. Right. The last possible thing that the investigative reporter could have done is refer to outside organizations that are designed to provide legal advice to journalists. We submit that the Sun Times didn't do that. In the Sun Times reply brief, they state that a reporter who looked at the DPPA and sought outside guidance still would have no idea what the Sun Times protects. That raised the question for me, where would a reporter turn to identify information or to get legal advice on statutes that govern... ACLU, I just told you. There's also an organization called the Reporters Committee for the Freedom of the Press, which is the preeminent organization dedicated to providing legal advice. Though I didn't address it in our brief, it didn't come up until the reply brief of the Sun Times. That agency has been around since 1970, and it's designed to instruct reporters on the basics of their actions and their news-gathering techniques. They have a page for FERPA, they have a page for the HIPAA, and they have a page for the DPPA. The first paragraph regarding the DPPA states that the protected privacy information includes all information attached to a person's driver's license record and applications such as their name, their address, their telephone number, their vehicle description, their Social Security number, their driver's ID number, photograph, height, weight, gender, age, and driving-related medical conditions and fingerprints. Different states have different things on the driver's license, but all the stuff that they cover is things that could potentially allow a would-be stalker to identify an individual. So even if they didn't look at the act itself, if they saw any guidance whatsoever, I think they would have been able to determine that this act protects this type of information. But we submit that these officers were acting merely as citizens when they surrendered their personal information in exchange for a driver's license. We contend that the DPPA is designed to protect exactly that circumstance. People don't walk in to get a driver's license in exchange for the potential that their information could be handed over to would-be stalkers, and that's what this act is designed to protect. Any reasonable definition of the word identity necessarily encompasses both what makes us unique and what makes us recognizable. And we feel as though the Sun-Times obtained this personal information from the DMV and published it to suggest that these particular officers were in this particular lineup in order to make it difficult for eyewitnesses to identify the suspect. Well, that's the point of the whole story. Well, Your Honor, the Sun-Times just stood up here and said that that was the point of the whole story, but that somewhat contradicts what the lineup article suggests. But even if that was the point of the story, Illinois law requires... Can you think of any other point of the story than the fact that they wanted to make it difficult for the identification? I'm not going to assume that I could imagine what the Sun-Times was thinking. I think in their rush to put out a story... A wild guess. Why do you think they wanted all that information? I think that they were trying to show that there was cover-up. But our position is that Illinois law requires... That makes it difficult for the victim to identify the perpetrator of the crime. Right, but Illinois requires that. That's what the point of lineups are. While grouping together individuals who share similar physical characteristics makes it difficult to identify a unique individual, that's the whole point of the logic behind lineup law or law governing lineups is that you want to test the veracity and the ability of the individual to recall and identify an individual. The logic behind the DPPA is to protect personal information that we or the millions of citizens in America submit to their state's DMVs from falling into the wrong hands. And it's our position that the Sun-Times, by publishing this information in its rush to publish this story, overlooked the fact that it was putting that information into the hands of every single individual that reads the Sun-Times. The statutory definition of the Act itself, you can begin and end any analysis with looking at the plain language. The plain language states that 2725.3 defines personal information as information that identifies an individual. The word any is not in there. But we contend a common sense reading of the Act necessarily includes it. The reason that information is on a driver's license is that so when someone, like a law enforcement agent, looks at the driver's license and compares it to the individual, they can identify that the person possessing that license is actually the person. That's the whole point of that information. And the Sun-Times said that these individuals were so similar in this lineup that they looked like twin brothers. The suspect was bald, but the rest of the people in the lineup had hair. So they weren't identical. Very different. In other contexts, where individuals are being sought, whether it's missing persons or a suspect, most wanted signs, those types of contexts include this type of personal information. That individual is this tall or this heavy, they have this color hair and these color eyes. It's common sense that the Act controls and protects this type of information. And even if the Act by itself is not clear, the word including in the list of information that it does protect, we advocate that this court follow the Supreme Court's lead in the Reno v. Condon case, which employed the illustrative use of the word including as opposed to the limited use. In Reno v. Condon, 528 U.S. 141, page 144, the court said that when noting that the DPPA defines personal information and they inject it as any information that identifies an individual. They could have simply stated the statutory definition as information that identifies an individual. But they chose to inject the language in there that covers whatever someone could possibly use to find somebody. The Sun-Times disregards the fact that they published the middle names of these officers. We feel like they published the middle names of these officers so that people could identify these officers and find these officers. As recently as Monday of this week, the Sun-Times ran a story in which this is where we're at with this investigation and listed 53 individuals that were involved in the investigation whether they were retired or where they were at following the investigation. I believe they were trying to demonstrate that no one had been disciplined because of the investigation. But conspicuously absent were these five plaintiff appellees. So the Sun-Times in this article concedes that these individuals had nothing to do with this investigation.  Lineups oftentimes rely on citizens. In past days, they exclusively relied on citizens, but citizens have become more reluctant to help law enforcement. We're addressing three former prosecutors. We're fairly familiar with the lineup. A citizen could have submitted themselves to this lineup and then they would be the one who would be the plaintiff in this case saying, my information, I submitted it to the DMV. It should be protected by this act. Furthermore, the primary purpose of the act, we believe, clearly protects this type of information. The goal of this act was to protect information. So what are you requesting in this injunction? I have difficulty with that. You're not wanting the Sun-Times to go around to each of its subscribers and ask for that publication back, are you? Certainly not, no. I want to keep my copy for posterity. We're only requesting that the Sun-Times take down the story from its website. At least not take down the story, but take down the information of these officers. But now that it's out there, that can't really be achieved, can it? Well, it's on the Internet. So somebody who hasn't looked at it, one of the plaintiff appellees may arrest somebody or may stop somebody and that individual is a criminal or someone who has nefarious intent and they want to have retribution on these officers. They potentially could find this information on the Internet and then use that information to find these officers. And that's our concern. Don't these officers have to display their identity if requested by a citizen? For example, don't their badges have to? Their badges have their last name on their uniforms. And even a detective who doesn't wear a badge has a badge that has to be displayed if requested? Yes, but it doesn't have their middle initial. But what about the publication that the city does of officers' names that's referred to in the briefs? Well, that is something separate. We think the DPPA protects this type of information and they use this type of information. And part of the problem here is that this information potentially was ascertainable for the sometimes other context. They didn't have to go to the DMV and access this information. They chose to do that. And they chose to then fall under the subjectivity of the DPPA. If they had walked up to the officers and asked them what their height and weight were and they surrendered it, then they could have published this information. But that's not what happened here. They went to the DMV and extracted this information and then published this information. And that's a direct violation, in our opinion, of the Drivers Protecting Privacy Act. Okay? I'm out of time. If you have a concluding remark, I don't want to cut you off. No, that's all. We think that this information is designed to be protected and we feel like it wasn't protected in this case. Let me ask this. Is a Chicago police officer required to have an Illinois driver's license? I believe they are, yes. Thank you. Now Mr. Tenney. May it please the court, Daniel Tenney for the United States. The Drivers Privacy Protection Act was designed to allow citizens to submit information to the State Department of Motor Vehicles without simultaneously making all of that information available to the public. On the statutory issue presented here, the Sun-Times' position is that the information has to uniquely or be sort of identifying very specific information to a particular person. That can't be reconciled with the plain text of the statute which enumerates examples in the list following the word including. Among the examples are medical and disability information. Now if you know somebody's medical and disability information, that doesn't help you find the person. That's just information about a person. You could describe it as identifying information and Congress clearly conceived of it that way and that's why it included it in the list. But once you know that that information is included within the definition of personal information, then the theory that the Sun-Times is advancing just doesn't work anymore. And then if you just think about the purposes of the statute, the idea was if somebody is submitting their information to the DMV, that that information shouldn't get into the other hand. In the stalker example, which has been talked about, although that's not the only purpose of the statute, if you had, for example, an online stalker who had a lot of information about the person but didn't know what the person looked like, the idea that Congress would have contemplated that the person could go, oh, I'm trying to find Mary Smith. Can you please tell me everything you know about her? And the DMV says, well, we can't give you her address because that's identifying information. But here's her height, weight, date of birth, eye and hair color, race. It's inconceivable that that is what Congress contemplated here. Congress was clearly talking about if you submit your information to the DMV, which you have to do in most states, that they won't turn around and give that information. The same with solicitations. We gave the examples in our brief. If someone said, all right, I want to solicit some people. I want people who are a certain weight. I want people who are a certain age. I'm going to the DMV to sort of call my list to decide who to solicit. It's inconceivable that Congress would have thought that that information should be available from state departments of motor vehicles. That was exactly the point of the statute, to say that if you have information, personal information, that's the statutory term we're applying here. The idea that you would say that that information doesn't include basic identifying information descriptive of an individual that a person might want to keep private. So this is a prosecutable offense, right? There's criminal enforcement provision, isn't there? There's a fine. It's a criminal fine. Department of Justice is the agency that would pursue that, correct? That's right. The reporter who sought the information and whoever was involved in the disclosure of it and publication is subject to criminal prosecution. Could be. Why not, if it just could be? I'm saying they would be subject to it. I'm not saying such a prosecution would be instituted. But that same point was made in the Maricich case in the Supreme Court, which was discussing someone who thought that they had a protected use and they said, this isn't a criminal case, but it could be criminally prosecuted, so we want to avail ourselves of the rule of lenity. The Supreme Court said in that case that although there was a plausible construction of the statute under which what had been done would be entirely permissible, that if you read the act as a whole, that the other reading was the better reading and therefore they adopted a reading that would have imposed liability in that circumstance. We submit that this case is an easier case than that one because here there is no plausible reading. I don't even know that sometimes has an articulated definition that holds together that they say should apply. The closest they've come is to say, well, it has to be something that's really identifying and narrows down to a particular person, but that doesn't account for the fact that medical and disability information is clearly included within the statutory term. And so that can't be the definition and so we submit that the proper definition is to say that when you're talking about information that people are submitting that's descriptive of the person, that's canonical identifying information, if you ask someone, do you have any identifying information, and they said, oh, I have height, weight, eye and hair color, that would date of birth, that would seem logically to fit within the statute, so we submit that our reading is sufficiently a better reading that any sort of canon construction related to the fact that there could conceivably be a criminal fine wouldn't overcome that. So sometimes argues a permissible use here as well. They argue that in this court, the district court concluded, stated in each of its orders, that no permissible use had been argued, and so we have not taken a position on that issue in this court. Well, why wouldn't the permissible use provision that they cite also get the broad reading that you're putting to this definitional section? Well, again, we're not taking a position on whether this was a permissible use. They're citing an Illinois statute and saying the Illinois statute falls within a definition of a state law authorizing public safety. How you read that is not something the district court resolved and therefore not something I'm in a position to address for the first time from the podium here. Turning to the First Amendment question, this court held in Travis that there is no constitutional right to obtain information from the government. And quite rightly analogized to the Privacy Act, which in the federal context, when the federal government maintains information about an individual, the Privacy Act restricts the ability of private citizens and, indeed, of other government agencies to obtain that information. And so to the extent that the newspaper is arguing that they have a constitutional right to access this information, that's foreclosed by circuit precedent and that circuit precedent was plainly correct. And so then the question here is, well, how can Congress go about, since it has authority under the Constitution to prohibit people from delving into other people's private information, how can they enforce that? And in this case, just the obtaining of the information is a violation of the statute and subject to a damages remedy including a liquidated damages provision. So that alone would suffice that the motion to dismiss should be denied. But the newspaper's argument then to follow up on that is to say, OK, well, as far as I can tell, they're saying, all right, even if we didn't have a right to obtain the information, having obtained it, the measure of damages for how much damage was caused by the fact that we unlawfully obtained this information can't take account of the fact that we then turned around and published it to the world. And that is a remarkable proposition in the cases that they're relying on like Bart Niki in the Florida Star and the Daily Mail case. Those were circumstances in which the information was obtained lawfully and the Supreme Court emphasized in each case that it's unfair to say, well, if you obtain the information lawfully, you shouldn't be deterring publication doesn't achieve the goal that Congress or the state statute in the cases in that case were seeking because what they're trying to deter was the unlawful acquisition of information. And the Supreme Court said, well, you can't go about that by punishing someone down the line who publishes it, who wasn't the one who unlawfully obtained it. Here, we're looking at the person who unlawfully obtained the information and the Supreme Court distinguished that case. And then the Supreme Court also recognized that there's a separate interest, apart from deterrence, in protecting the privacy of the information at issue. In those cases, there were different types of privacy. But here, Congress has a valid interest in saying if you submit information to the Department of Motor Vehicles, you don't thereby consent to making it available to the world. And that's a legitimate interest for Congress to protect. And the Supreme Court, although the issue wasn't in those cases about exactly how you would go about deterring or protecting that, the Supreme Court said, well, the place to do this is to go after the person who's actually unlawfully obtaining the information. And so, in these circumstances, all we're talking about is saying Congress concluded that when a person submits information to the Department of Motor Vehicles, that other people can't obtain that information unless it's for a permissible use. It permissibly concluded that. That's the Travis case. And then the question is just what the remedy is. And the idea that the remedy would be the damage caused by the unlawful obtaining of the information and subsequent dissemination is unless the Court has any questions. Thank you, Your Honor. Mr. Dunn. Mr. Dunn, if you might help me a little bit on this. You explained what the journalistic interest was in obtaining the information. And the evil, as you suggest, may have occurred here was this similarity to visuals. What journalistic interest was there in doing more in an article than showing that? Why would disclosure of other information aid in the investigation? Confirming detail. Confirming detail, Your Honor. I'm assuming these aren't mannequins. You have the photo. We have the photo and we have the names. They all could have had the same name. It wouldn't matter. It's just the similarity is what you suggest. We're trying to see the sweep of this statute, what it protects, and obviously balance against First Amendment interests. Just give me a little help on the First Amendment interest on showing more than that the visuals make the point. I guess that's my first inquiry. I have another question, too. Don't worry about the time. I think that the combination of the visuals and the text are self-confirming and they drive the point home. As my colloquy with Justice Bauer demonstrated, the visuals really don't even do the similarities justice. But more important from the First Amendment sweep, if the court gets into asking, well, why did you put this in and you didn't put this in, there's a long, long line of Supreme Court precedent in this court that says courts should not get involved in the It's efficient. Thank God. You know, I second that from my position on the podium. I think then that when the court starts playing editor, we trigger those concerns even more so than we give this prosecutorial dream flexibility  So that not only names, but then would it have been appropriate to show home addresses? I don't know. If you look at all the things that are protected in the statute that are listed there as identifiers, none of them are included. One reason might be they're in the statute. The other reason, though, is they're not germane. As the district court pointed out, the only things in there are germane to the similarities of the lineup. So there's no reason to put Social Security numbers in. No reason for driver's license. But names? Names because newspapers publish names. Every week they get called, take my name out of the police blotter. No. Names get published. In this case, the name comes from the FOIA request. We're not even arguing about the names. I wonder, Mr. Dunn, if you might respond to the government argument that you do not cite authority for the proposition that an entity that obtains information by breaking the law enjoys a First Amendment right to disseminate that information. The cases you cite seem to all come from having lawfully obtained information. So they make that charge, the government, that this is a different case. And I just wonder if you might speak to that. Certainly. I thought this was resolved with Garrison v. Louisiana. It's a truthful report on a matter of public affairs. It can't be penalized. Because what we're really after here is the publication. We don't care if the Secretary of State gives us the information. They obviously read this very clear statute to allow them to do so. But I also think that Bartnicki is a case where there was no question. The reporters violated the statute in Bartnicki. They had reason to know that that was a legally intercepted cell phone conversation. It made no sense to the Supreme Court. Indeed, the Supreme Court has left it as an open question as to whether they could have gone much farther. So if the reporters knew that this violated the Act somehow, and frankly, this is not a clear Act. We would not be here unless there was a substantial question as to whether this is a clear Act. The District Court, if anything, found the Act was more clear in our favor than theirs. And this Court, as you know, gets the final word. Some of us did not find it as clear as others. Well, you know, the Sene case I think is as clear as mud, and the ultimate resolution of the Sene case just proves that point. Justice Connelly had to wade through it, and he found oh, this doesn't keep hands, this doesn't seal this information away. There's 14 permissible uses. What about this reason that the Act, in part, was at least enacted was to address the stalker aspect. And that's why I returned to the spirit of the Act on the names. Now, I understand the face can be identified, but I just wonder if there's a crossing of the line. I understand the interest of putting a name to a photo. But you have to put this in chronological order. Sometimes gets the names from the FOIA request after appealing to the Illinois Attorney General. Sometimes gives the names to the Secretary of State. They don't get the names from the Secretary of State. They give the names to the Secretary of State. They say, give me the stuff not covered by the Act. It shows that these guys all look the same. That's the situation we have in this case. If we had gotten the names and published them and the dates of births and the Social Security numbers, I'd be up here arguing First Amendment all 20 minutes of my time. But we didn't. I think also if we look at the cases, none of them parse this question except the Connecticut case that came down our way. Your Honors know, can parse any better than I can. But none of the considerations in SENE are issued in this case. There's no First Amendment clause. There's no danger of stalkers as the D.C. Court found. There's no identity theft from this because we didn't publish Social Security numbers or telephone numbers or home addresses. It wasn't germane. So all I can say is that in this case, the Sun-Times reporter should have been commended, not sued. And the alternative to that is this prosecutorial flexibility that basically allows them to prosecute anybody who tries to pick and choose in that act. And as the amici brief pointed out, this is common. Reporters often need this information and they break big stories with it. Though I would suggest none bigger than this one. Thank you, Mr. Dunn. Thanks to all counsel. The case is taken under advisement.